IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - x
OFFICIAL COMMITTEE OF          :
UNSECURED CREDITORS OF         :
RADNOR HOLDINGS                :
CORPORATION, et al.,           :     Case No. 06-782 (***)
                               :
        Appellant,             :
                               :
    v.                         :
                               :
TENNENBAUM CAPITAL             :
PARTNERS, LLC, et al.          :
                               x
        Appellees.
- - - - - - - - - - - - - -
                               :
In re:                         :     Chapter 11
                               :
RADNOR HOLDINGS                :     Case No. 06-10894 (PJW)
CORPORATION, et al.,           :
                               :     Jointly Administered
        Debtors.               :
                               :
- - - - - - - - - - - - - x

**OBJECTION OF DEBTORS TO APPELLANT'S MOTION TO EXPEDITE
APPEAL OF ISSUES 4 THROUGH 9 RELATING TO COMPENSATION OF
COMMITTEE'S PROFESSIONAL ADVISORS, AND TO STAY ALL OTHER
ISSUES ON APPEAL PENDING RESOLUTION OF THE EXPEDITED
APPEAL**

The debtors and debtors in possession in the

above-captioned cases and the appellees in the above-

captioned appeal before this Court (collectively, the

"Debtors" or the "Appellees")[1], by and through their undersigned attorneys, hereby object (the "Objection") to the Motion of the Official Committee of Unsecured Creditors (the "Committee" or the "Appellant") to Expedite Appeal of Issues 4 through 9 Relating to Compensation of Committee's Professional Advisors, and to Stay All Other Issues on Appeal Pending Resolution of the Expedited Appeal (D.Ct. Dkt. 6) (the "Motion").  In support of the Objection, the Debtors respectfully represent as follows:

---

[1]    The Debtors are the following entities: Radnor Holdings Corporation ("Radnor"), Benchmark Holdings, Inc., Radnor Asset Management, Inc., Radnor Chemical Corporation, Radnor Delaware II, Inc., Radnor Investments II, Inc., Radnor Investments III, Inc., Radnor Investments, Inc., Radnor Investments, L.L.C., Radnor Management Delaware, Inc., Radnor Management, Inc., StyroChem Delaware, Inc., StyroChem Europe Delaware, Inc., StyroChem GP, L.L.C., StyroChem LP, L.L.C., StyroChem U.S. Ltd., WinCup Europe Delaware, Inc., WinCup GP, L.L.C., WinCup Holdings, Inc., WinCup LP, L.L.C., WinCup RE, L.L.C., and WinCup Texas, Ltd.

## PRELIMINARY STATEMENT

1.    Through the Motion the Committee seeks, pursuant to Rules 2 and 27 of the Federal Rules of Appellate Procedure (the "Federal Appellate Rules") and Rules 8011 and 8019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to expedite a portion of the Committee's pending appeal (the "Sale Order Appeal") of the Order (1) Approving Sale of Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and (3) Granting Related Relief (the "Sale Order").  In addition, the Committee seeks to stay all other appeals currently pending before this Court in connection with the above-captioned, jointly administered bankruptcy cases (the "Bankruptcy Cases"). For the reasons set forth more fully below, the Debtors object to the Motion and respectfully request that the Motion be denied.

2.    The Committee has failed to demonstrate any legitimate cause for bifurcating the Sale Order Appeal, staying all other pending appeals and/or

expediting those issues related to payment of
professionals employed by the Committee, which issues
were raised by the Committee in the Sale Order Appeal.

     3.   First, through the Motion, the Committee
seeks to expedite this Court's decision with respect to
fees and expenses of the Committee's professionals that
have not been approved by the United States Bankruptcy
Court for the District of Delaware (the "Bankruptcy
Court") and that, in fact, are subject to pending
objections by the Debtors and the purchaser of the
Debtors' assets.  Such issues are, therefore, not even
ripe for a decision by this Court.[2]

     4.   Second, the Committee seeks a ruling from
this Court requiring a third party, non-debtor to assume
payment of the Committee's unapproved fees and expenses
-- a liability which such third party expressly did not

---

[2]   The Committee has raised a number of issues in the Motion that
are more properly addressed through briefing in connection
with the Sale Order Appeal.  The Debtors respond herein only
to those factual and legal allegations that are necessary for
a determination on the Motion.  The Debtors, however,
expressly reserve all of their rights to respond to all issues
raised by or in connection with the Sale Order Appeal,
including but not limited to issues addressed herein, in
accordance with any briefing schedule ultimately approved by
this Court.

contract for in purchasing substantially all of the Debtors' assets. As this novel argument is unsupported by the law and the Committee is unlikely to succeed in its attempt to undo the Sale Order, an expedited determination of the Committee's position is both unnecessary and unwarranted.

5.    Third, granting the relief requested by the Committee will cause substantial harm to the Debtors and their estates by, among other things, causing the Debtors and their estates to incur additional, unnecessary administrative expenses and further delaying a final decision with respect to certain issues that are critical to the Debtors' efforts to confirm a liquidating plan of reorganization in the Bankruptcy Cases.

6.    Accordingly, for these reasons, as set forth more fully below, the Debtors respectfully request that the Motion be denied.

## BACKGROUND

7.    The Committee has set forth the procedural background of the Bankruptcy Cases in the Motion. Although the Debtors disagree with the

Committee's presentation of certain events that occurred
in the Bankruptcy Cases, in the interests of brevity,
the Debtors have corrected only those procedural and
factual misstatements by the Committee that might
otherwise impede this Court's determination of the
Motion.  The Debtors reserve all of their rights to
address such procedural and factual issues in any
briefing ultimately ordered by this Court in connection
with the Sale Order Appeal or otherwise.

      8.   Because the Committee has raised certain
issues with respect to the Debtors' post-petition
financing in the Motion, it is important that this Court
have an understanding of the Debtors' secured debt as of
August 21, 2006 (the "Petition Date").  On December 1,
2005, Radnor, Tennenbaum Capital Partners, LP
("Tennenbaum"), as agent, and two of Tennenbaum's
affiliates, Special Value Expansion Fund ("SVEF") and
Special Value Opportunity Fund ("SVOF"), (collectively,
the "Tennenbaum Lenders") entered into a credit
agreement (the "Credit Agreement") pursuant to which the
Tennenbaum Lenders provided the Debtors $95 million of
secured debt financing (the "Tranche A and B Loans").

The Tranche A and B Loans were guaranteed by certain of
Radnor's Debtor affiliates, and secured by a first
priority lien on substantially all of the Debtors'
machinery and equipment located in the United States,
and owned real property relating to nine of the Debtors'
U.S. manufacturing facilities (the "Tennenbaum Loan
Collateral").

     9.   On April 4, 2006, Radnor and the
Tennenbaum Lenders amended the Credit Agreement, and the
Tennenbaum Lenders provided Radnor and its affiliated
companies with an additional $23.5 million of secured
debt financing (the "Tranche C Loans," together with the
Tranche A and B Loans, the "Tennenbaum Term Loan").  The
Tranche C Loans were made on substantially the same
terms as the Tranche A and B Loans, except with respect
to interest, prepayment and certain remedies.
Subsequent to the Petition Date, the Tennenbaum Lenders
filed secured proofs of claims based upon the Tennenbaum
Term Loan against each of the Debtors (collectively, the
"Tennenbaum Claims").

     10.   As of the Petition Date, the Debtors were
also party to a certain prepetition revolving facility,

by and among, Radnor, National City Bank and Silver Point Capital, under which the Debtors were indebted in the approximate amount of $63.4 million (the "National City Facility").

11.   Subsequent to the commencement of the Debtors' chapter 11 cases, the Bankruptcy Court entered an order (B.Ct. Dkt. No. 278) (the "Final DIP Order") authorizing the Debtors to enter into a debtor in possession financing facility with affiliates of Silver Point Finance, LLC (collectively, the "DIP Lenders"). Pursuant to the Final DIP Order, the Debtors paid off the National City Facility and were authorized to borrow up to an additional $38 million for working capital and other needs.   This additional borrowing was secured by first lien priming loans on the Tennenbaum Loan Collateral (the "DIP Priming Liens") to which DIP Priming Liens the Tennenbaum Lenders consented.  See Final DIP Order at pp. 23-25.

12.   The Committee also makes certain assertions with respect to its litigation with the Tennenbaum Lenders and certain of their affiliates. Among other things the Committee states that through its

litigation with the Tennenbaum Lenders it was merely pursuing certain claims and causes of action that others, including the Debtors and its professionals, also believed were valid.  See Motion at ¶ 3.

13.  In fact, the Committee was granted standing to pursue its litigation over the objections of the Debtors.[3]  Moreover, the complaint filed by the Committee was not merely a recitation of certain causes of action that counsel for a special committee of Radnor's board of directors believed was appropriate. Indeed, the causes of action actually identified by counsel for the special committee related to liens obtained by the Tennenbaum Lenders in connection with the Tranche C Loans.

14.  Even the Bankruptcy Court expressed concerns with the causes of action that the Committee proposed bringing against the Tennenbaum Lenders and certain of their affiliates.  Specifically, on October 27, 2006, the Bankruptcy Court held a hearing (the

---

[3]    The Debtors have filed an appeal with respect to the Bankruptcy Court's decision to grant the Committee standing to pursue such action.  This appeal (the "Standing Order Appeal") remains pending as of the date of this Objection.

"Standing Hearing") with respect to the Committee's motion for standing to pursue certain causes of action against certain entities or individuals associated with the Purchaser.  Although the Bankruptcy Court ultimately granted the Committee standing, at the Standing Hearing, the Bankruptcy Court specifically advised counsel for the Committee:

> But let me make this comment.  Quite candidly, as some of the Counts I consider - how should I put it - longshots . . .
>
> Well, let me just say that if at the end of the day these Counts don't have merit sufficient for me to enter anything in your favor, come fee application time, you may be subject to a severe adjustment.
>
> I don't know enough about this - I've read your complaint, but I haven't seen the evidence.  But it's going to be a very expensive proposition and unless the estate benefits, I'm going to have to ask why anybody should be paid for what we did.

Transcript of Standing Hearing, relevant portions of which are attached hereto as Exhibit A, at 75-76.

15.  After the entry of the Standing Order, on October 31, 2006, the Committee filed its sixteen count, sixty page Complaint against Tennenbaum Capital Partners, LLC, Special Value Expansion Fund, LLC, Special Value

Opportunities Fund, LLC and Jose E. Feliciano (the
"Complaint") in the Bankruptcy Court.  On November 2,
2006, the Committee commenced a trial (the "Tennenbaum
Claims Trial") with respect to the Complaint.  Following
a trial extending over seven days, the Committee
withdrew six of the sixteen counts in the Complaint.
Subsequently, on November 16, 2006, the Court entered
the Judgment in Favor of Defendants on All Counts (Bankr.
Adv. D.I. 38) (the "Judgment") and the Amended Findings
of Fact and Conclusions of Law (Bankr. Adv. D.I. 41)
(the "Findings and Conclusions"), ruling against the
Committee on all counts prosecuted by the Committee in
the Tennenbaum Claims Trial.  As the Bankruptcy Court
stated at a subsequent hearing, and as evidenced by the
Judgment and the Findings and Conclusion, the Committee
ultimately "made no case. Its case totally lack[ed]
merit.  Its proposed findings were, quite frankly,
outlandish in light of the record."  Transcript of
November 21 Hearing, true and correct copies of relevant
portions of which are attached hereto as Exhibit B at 37.

        16.  On November 20, 2006, the Committee filed
its notice of appeal with respect to the Judgment and

the Findings and Conclusions  (Bankr. Adv. D.I. 42) (the
"Tennenbaum Appeal").  Also on November 20, 2006, the
Committee filed an emergency motion with the Bankruptcy
Court seeking to stay the Judgment and the Findings and
Conclusions and to delay the Debtors' sale process
(Bankr. Adv. D.I. 44) (the "Bankruptcy Stay Motion").
On that same date, the Committee filed two motions with
this Court, in case number 06-702, one seeking to
expedite the Tennenbaum Appeal (D.Ct. Dkt. 1) (the
"Motion to Expedite") and one seeking to stay the
Debtors' ongoing sale process pending the Tennenbaum
Appeal (D.Ct. Dkt. 2) (the "Motion to Stay").  On
November 21, 2006, the Bankruptcy Court entered an order
denying the Bankruptcy Stay Motion. Later that day,
Judge Jordan of this Court entered an order denying the
Motion to Expedite and the Motion to Stay.  As of the
date of this Objection, the Tennenbaum Appeal remains
pending before this Court.  To date, no mediation or
briefing has occurred.

        17.  The Committee correctly notes in the
Motion that the Debtors sold substantially all of their
assets to TR Acquisition Co., Inc. (the "Purchaser"), an

affiliate of the Tennenbaum Lenders pursuant to the Sale Order entered on November 21, 2006. See Motion at ¶ 2. The Committee further correctly states that the Purchaser was permitted to credit bid the Tennenbaum Claims following the Committee's spectacular failure to challenge such claims. Indeed, the Purchaser credit bid that portion of the Tennenbaum Claims representing the Tranche A and Tranche B Loans and those secured debts have been satisfied as a result of the sale to the Purchaser (the "Sale").

18. However, although an auction was held, and although the Committee was permitted to spend $500,000 of estate assets to reimburse any potential bidders for due diligence expenses, no competing bids were received. Accordingly, the Purchaser and/or its affiliates continue to have a significant secured claim against the Debtors and their estates after the Sale. The Sale closed on November 29, 2006 (the "Closing Date").

19. On December 1, 2006, after the Closing Date, the Committee filed their notice of appeal with respect to the Sale Order (the "Sale Order Appeal"), the

third of the appeals that are currently pending before
this Court.  As of the date of this Objection, the Sale
Order Appeal remains pending before this Court.  To date,
no mediation or briefing has occurred.  Moreover, prior
to the filing of the Motion, the Committee had made no
request to expedite such appeal.  Indeed, the Committee
waited until December 1, 2006, the very last day to file
an appeal, to even file its notice of appeal with
respect to the Sale Order.

      20.  The Committee also admits in its motion
that in the span of approximately three months, the
Committee's two separate law firms, two financial
advisors, and two litigation consultants retained in
connection with the failed Tennenbaum Claims Trial
amassed fees and expenses in excess of $4.5 million.
The Committee implies that Tennenbaum and the Debtors
have objected to the fees filed to date solely on the
basis that the Sale Order provides no means for the
Debtors to pay such fees and expenses.  See Motion at ¶
25.  In fact, in their objections to such fee
applications filed to date the Debtors have asserted
that, in light of the Committee's complete failure in

the prosecution of the Tennenbaum Claims Trial and the lack of any benefit for the Debtors to date in connection with the Committee's investigation of the DIP Lenders, the Committee's professionals have provided no benefit to the Debtors' estates.  Therefore, under Bankruptcy Code section 330 such professionals are not entitled to payment from the Debtors' estates.

21.  Moreover, the Committee and its professionals have failed to adequately specify which of its fees and expenses are for those matters for which payment is provided under the terms of the Sale Order in an amount not to exceed $200,000 for the investigation of the Tennenbaum Claims and $100,000 for an investigation of the claims of the DIP Lenders.  Upon information and belief, and as a result of the Debtors' initial review of such fee applications, a majority of the Committee's fees and expenses relate to such matters investigative matters.  Thus, despite having full knowledge of the caps provided in the Final DIP Order for such investigations, the Debtors believe that the Committee and its professionals have exceeded such caps by millions of dollars.  In essence, the Committee and

its professionals completely disregarded the budgets and caps established by the Final DIP Order in an effort to "swing for the fences" in connection with the Tennenbaum Claims Trial and now expect Tennenbaum and the Debtors' professionals to pay for such risk.  See Motion at ¶¶ 24, 30.

22.  The Bankruptcy Court has scheduled an interim hearing with respect to all professional fee applications for which final orders have not to date been entered on March 13, 2007 at 10:00 a.m.  However, to date, the fee applications of the Committee's professionals have not been approved or disallowed on a final basis by the Bankruptcy Court.  Nor will such final approval occur in the near term.

OBJECTION

23.  As set forth below, the Committee's Motion should be denied on both procedural and substantive grounds.  First, the Committee has failed to comply with Bankruptcy Rule 8011 which governs motions seeking expedited relief.  Additionally, not only has the Committee failed to articulate a legitimate and sufficient basis for expediting only that portion of the

Sale Order Appeal that the Committee (and/or its professionals) maintains is most pressing, the Committee has additionally failed to show - or even allege -- that irreparable harm would result from a denial of the Motion as this Court has required.[4]  Furthermore, the Committee cannot demonstrate that granting the relief requested in the Motion is warranted.  See Fed. R. App. P. 2; Fed. R. Bankr. P. 8019.  Accordingly, this Court should deny the Committee's Motion.

**I.    THE COMMITTEE'S MOTION SHOULD BE DISMISSED BECAUSE IT FAILED TO COMPLY WITH FED. R. BANKR. P. 8011**

**The Motion Does Not Satisfy The Requirements Of Fed. R. Bankr. P. 8011(d)**

24.  Rule 8011(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") governs

---

[4]    The Committee filed the Motion pursuant to Federal Appellate Rules 2 and 27 and Bankruptcy Rules 8011 and 8019.  See Motion at 1.  The Federal Appellate Rules, however, specifically provide that they are to "govern procedure in the United States courts of appeals."  Fed. R. App. P. 1; but see Grand Union Co. v. Saul, Ewing, Remick & Saul (In re Grand Union Co.), 200 B.R. 101, 106 (D. Del. 1996) (noting that when sitting as an appellate court reviewing a bankruptcy court decision, district court may apply the Federal Appellate Rules).  Moreover, the Federal Appellate Rules and the Bankruptcy Rules provide different time periods for responding to motions.  Compare Fed. R. Bankr. P. 8011(a) (providing seven days to respond to a motion) and Fed. R. App. P. 23(a)(3) (providing eight days to respond to a motion).

expedited motions to a district court or bankruptcy appellate panel. Thus, Bankruptcy Rule 8011(d) applies to the Committee's Motion. See In re Marina City Assocs., No. 89 c 3453 (IDR), 1989 U.S. Dist. LEXIS 7025, *20 n.7 (N.D. Ill. June 7, 1989) (noting that trustee's failure to comply with Bankruptcy Rule 8011(d) was "an alternative ground for denying the Emergency Motion to Withdraw the Reference").

25. Bankruptcy Rule 8011(d) provides, in pertinent part, that:

> Whenever a movant requests expedited action on a motion on the ground that, to avoid irreparable harm, relief is needed in less time than would normally be required for the district court or bankruptcy appellate panel to receive and consider a response, the word "Emergency" shall precede the title of the motion. The motion shall be accompanied by an affidavit setting forth the nature of the emergency.

Fed. R. Bankr. P. 8011(d). Moreover, that rule also provides that:

> Prior to filing the motion, the movant shall make every practicable effort to notify opposing counsel in time for counsel to respond to the motion. The affidavit accompanying the motion shall also state when and how opposing counsel

> was notified or if opposing counsel was
> not notified why it was not practicable
> to do so.

Id.

26.   The Motion was filed on January 11, 2007 without prior notice to the Debtors.  It was not accompanied by an affidavit setting forth the grounds for expedited or emergency relief or why opposing counsel was not given prior notice of the filing.  The Motion was not captioned as an "emergency" motion. Moreover, the Committee not only failed to set forth any facts to show that "irreparable harm" would result if the Motion is denied, but the Committee did not even allege in its Motion that any irreparable harm would in fact result from such denial.

27.   Therefore, under Bankruptcy Rule 8011, the Committee's request for expedited consideration, as set forth in the Motion, must be denied.

## II.  THE COMMITTEE'S MOTION SHOULD BE DENIED BECAUSE IT FAILED TO ALLEGE ADEQUATE CAUSE

28.   As this Court has held, pursuant to Bankruptcy Rule 8019, this Court may reduce the time permitted for filing papers in connection with a reply

to an appeal.  See In re Combustion Eng'g, Case No. 03-
10495 (JKF), 2003 Bankr. LEXIS 1044, at *3-4 (D. Del.
July 2, 2003) (reducing time for filing briefs in
connection with anticipated appeals of contested
confirmation order under Bankruptcy Rule 8019).  To
obtain such relief, however, the movant should
demonstrate substantial, if not irreparable, harm.  Id.
(applying standards of irreparable harm under Bankruptcy
Rule 8011); see also 10 Collier on Bankruptcy ¶ 8019.01
("The primary purpose of Federal Rule of Bankruptcy
Procedure 8019 is to give the district courts and
bankruptcy appellate panels the power to expedite the
consideration of cases that are 'of primary concern to
the public or to the litigants.'"); Fed. R. Bankr. P.
8011.

     29.  The Committee has not, and cannot
demonstrate, that expedited relief with respect to the
Committee's fee issues is warranted or that "good cause"
otherwise exists for the relief requested.  In fact, as
demonstrated below, the Committee's request for
substantive relief is premature and expediting

consideration of that issue will actually prejudice the

Debtors.

**A.    The Motion Should Be Denied Because The Issues For Which The Committee Seeks An Expedited Determination Are Not Ripe For Appeal.**

30.  As set forth above, the Committee asserts

that its professionals' fees are at risk until such time

as this Court reverses the Sale Order with respect to

the amount that the Purchaser has specifically agreed to

fund for fees of the Committee's professionals.  See

Motion at ¶ 30.  In further support of its position, the

Committee argues that the Bankruptcy Court's decision

will have a "chilling effect" on the willingness of

committees in bankruptcy cases to pursue litigation such

as the Tennenbaum Litigation and on the ability of such

committees to retain competent professionals.  See id.

at ¶ 33.

31.  Although the Committee argues quite

strenuously that the public will be greatly harmed if

its professionals are not permitted to recoup millions

in fees and expenses, the Committee quite purposely

overlooks the fact that any issue regarding the

purchaser's obligation to pay the fees of the Committee professionals is simply not ripe for appellate review.

32. In particular, as set forth above, in the underlying bankruptcy cases, the Committee and its professionals have filed fee applications totaling in excess of $4.5 million, which fees are almost entirely related to the Committee's pursuit of litigation that the Bankruptcy Court found to be totally without merit. Those fee applications have met with objections from the Debtors and the Purchaser.[5] To date, the Bankruptcy Court has not ruled on either the fee applications or the objections to such fee applications. Thus, at the present time, the professional fees have not been allowed by the Bankruptcy Court, and they may never be allowed by the Bankruptcy Court.

33. Moreover, although an interim fee application hearing has been set for such fee applications, no such hearing has been held to date. In that regard, even if an interim fee order were entered

---

[5]    The Fee Examiner appointed by the Bankruptcy Court in the Bankruptcy Cases has also raised significant issues with respect to the fee applications of certain of the Committee's professionals that have not to date been resolved.

approving the Committee's professional fees -- which it has not -- such interim order would not be final and, therefore, nonappealable until entry of a final order. See In re Valley Forge Plaza Assoc., 119 B.R. 471, 472 (E.D. Pa. 1990) ("The courts have consistently held that the allowance of interim professional fees is interlocutory in nature" and therefore not appealable without leave from the court); see also In re Trans World Airlines, Inc., 1993 U.S. Dist. LEXIS 16810, *18 (D. Del. June 22, 1993) (concluding that as interim fee award on "substantial contribution" grounds was subject to further review of the bankruptcy court and therefore interlocutory "there is nothing from which to appeal").

34.    Thus, by its Motion, the Committee is requesting this Court to expedite its appeal on the propriety of the Bankruptcy Court's determination that the Purchaser need not pay or otherwise assume the Debtors' liability for any allowed fees and expenses of the Committee's professionals and to hear that issue prior to any such fees and expenses being allowed by the Bankruptcy Court.  That issue is not even ripe for appeal and, thus, plainly the Committee's request to

expedite its appeal of that issue should be denied.  See
County Concrete Corp. v. Roxbury, 442 F.3d 159, 164 (3d
Cir. 2006) ("The ripeness doctrine serves 'to determine
whether a party has brought an action prematurely and
counsels abstention until such time as a dispute is
sufficiently concrete to satisfy the constitutional and
prudential requirements of the doctrine.'") (quoting
Khodara Envtl., Inc. v. Blakey, 376 F.3d 187, 196 (3d
Cir. 2004) (internal citations omitted)).

**B.    The Debtors Will Suffer Harm If The Motion Is
       Granted.**

        35.  As noted above, if the relief requested
in the Motion is granted, the Debtors and their estates
will be harmed.  First, the Debtors will be compelled to
pay their professionals to pursue a second round of
briefing in connection with one of the three currently
pending appeals in the Bankruptcy Cases.  Just as the
Committee and its professionals face financing issues,
so too do the Debtors' professionals.

        36.  Specifically, pursuant to the Asset
Purchase Agreement, the Debtors and their professional
have only a limited budget of $750,000 with which to

pursue their rights in these pending appeals as well as to administer the Debtors estates and formulate and solicit, if possible, a plan of reorganization. If the Motion were granted, however, the Debtors and their estates would be compelled to shoulder the additional fees and expenses incurred by its professionals and, if approved, the fees and expenses of the Committee and its professionals.

37. Nor is the Committee correct that neither the Purchaser nor the Debtors will suffer any harm if the consideration of the Standing Order Appeal, the remainder of the Sale Order Appeal, and the Tennenbaum Appeal are further delayed. In fact, nothing could be further from the truth, and it is disingenuous for the Committee to now suggest that the consequences for its decision to pursue the Tennenbaum litigation should be foisted on the Debtors and its professionals.

38. Indeed, although the Committee suggests that there is a pot of available funds waiting to be tapped to reimburse the Committee's professionals, the funds that are available were specifically slotted for the Debtors' professionals and are, in fact, likely

insufficient to pay the Debtors' professionals allowed fees and expenses in full. Accordingly, a decision by this Court to re-allocate payments already negotiated with the Purchaser and in some instances made by the Purchaser, in whole or in part, will only serve to encourage more litigation that does not benefit the Debtors or their estates. Thus, despite the Committee's protestations to the contrary, public policy considerations weigh heavily against deciding in the Committee's favor in the Sale Order Appeal and granting the Motion.

      39. Indeed, a finding in favor of the Committee in the Sale Order Appeal, as well as the Motion, would only serve to encourage "out of the money" creditors' committees to undertake "long-shot" litigation at the expense of debtors' estates, professionals, and administrative creditors. See Transcript of Standing Hearing, relevant portions of which are attached hereto as Exhibit A, at 75-76 (Bankruptcy Court noting that the Committee's litigation was a "long-shot" and indicating that related fees were at risk if the long-shot failed).

C.    **The Committee Is Unlikely To Succeed On The Issues For Which It Seeks Expedited Review.**

40.    Finally, although argument with respect to the substantive issues regarding the Committee's position should await briefing in connection with the Sale Order Appeal, it should be noted that the Committee's position was rejected by the Purchaser and could not be compelled by the Bankruptcy Court.

41.    Specifically, although counsel for the Debtors tried to obtain additional payment for the Committee's professionals, the Purchaser would not pay such fees and further fund litigation against itself. See Transcript of November 21 Hearing, true and correct copies of relevant portions of which are attached hereto as Exhibit B.  The Purchaser in this instance could not be compelled to pay any costs not specifically negotiated in its asset purchase agreement with the Debtors.

42.    Moreover, the Committee's position has been rejected by the Bankruptcy Court in other cases. See, e.g., In re Trans World Airlines, Inc., 2001 Bankr. LEXIS 723, *13-16 (Bankr. D. Del. Mar. 27, 2001)

(refusing to compel purchaser of substantially all of
the debtors' assets to assume claims of United States
agency when asset purchase agreement did not seek to
assume such liabilities) (citing Rubinstein v. Alaska
Pac. Consortium (In re New England Fish Co.), 19 B.R.
323, 329 (Bankr. W.D. Wash. 1982)).

WHEREFORE, for the foregoing reasons, the

Debtors respectfully request that the Motion be denied.

Dated:       Wilmington, Delaware
             January 22, 2007


                          /s/ Mark L. Desgrosseilliers
                    Gregg M. Galardi (I.D. No. 2991)
                    Mark L. Desgrosseilliers (I.D. No. 4083)
                    Matthew P. Ward (I.D. No. 4471)
                    Sarah E. Pierce (I.D. No. 4648)
                    SKADDEN, ARPS, SLATE, MEAGHER
                    & FLOM LLP
                    One Rodney Square
                    P.O. Box 636
                    Wilmington, Delaware 19899-0636
                    (302) 651-3000

                    and

                    Edward J. Meehan
                    SKADDEN, ARPS, SLATE, MEAGHER
                    & FLOM LLP
                    1440 New York Avenue
                    Washington, DC  20005-2111
                    (202) 371-7000

                    Counsel for the Appellees, Debtors
                      and Debtors-in-Possession

EXHIBIT A
Standing Hearing Transcript (Excerpts)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No.  06-10894 (PJW)
                                    .
RADNOR HOLDINGS                     . Chapter 11
CORPORATION, et al.,                .
                                    . 824 Market Street
                                    . Wilmington, Delaware 19801
                  Debtor.           .
                                    . October 27, 2006
. . . . . . . . . . . . . . . . . . 9:30 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:              Skadden, Arps, Slate, Meagher
                                 & Flom, LLP
                              By:  GREGG M. GALARDI, ESQ.
                                   EDWARD MEEHAN, ESQ.
                              One Rodney Square
                              P.O. Box 636
                              Wilmington, DE 19899-0636


For the Committee:            Greenberg Traurig LLP
                              By:  FRANCIS CITERA, ESQ.
                                   VICTORIA COUNIHAN, ESQ.
                                   MATTHEW PREWITT, ESQ.
                                   THOMAS DUTTON, ESQ.
                                   NANCY MITCHELL, ESQ.
                              77 W. Wacker, Ste. 2500
                              Chicago, IL 60601



Audio Operator:               Brandon McCarthy

   Proceedings recorded by electronic sound recording, transcript
                  produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

APPEARANCES (Cont'd.)

| | |
|---|---|
| For National City Bank: | Ashby & Geddes<br>By:  RICARDO PALACIO, ESQ.<br>222 Delaware Avenue, 17th Floor<br>P.O. Box 1150<br>Wilmington, DE 19899 |
| For Post-Petition Lenders: | Pachulski, Stang, Ziehl, Young,<br>   Jones & Weintraub<br>By:  CURTIS A. HEHN, ESQ.<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705 |
| For Tennenbaum Capital: | Richards, Layton & Finger<br>By:  MARK COLLINS, ESQ.<br>     RUSSELL C. SILBERGLIED, ESQ.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801 |
| (Telephonic) | Milbank, Tweed, Hadley & McCloy LLP<br>By:  FRED NEUFELD, ESQ.<br>     KEN OSTROW, ESQ.<br>     GREGORY BRAY, ESQ.<br>601 South Figueroa Street<br>30th Floor<br>Los Angeles, CA 90017-5735 |
| For Office of U.S. Trustee: | Office of the U. S. Trustee<br>By:  MARGARET HARRISON, ESQ.<br>844 King Street, Room 2313<br>Wilmington, DE 19801 |
| For Four M Corporation<br>Four M Investments LLC: | Lowenstein, Sandler PC<br>By:  THOMAS PITTA, ESQ.<br>65 Livingston Avenue<br>Roseland, NJ 07068 |
| For Wilmer Cutler Pickering<br>Hale & Dorr: | Wilmer, Cutler, Pickering<br>   Hale & Dorr<br>By:  ANDREW N. GOLDMAN<br>399 Park Avenue<br>New York, New York 10022 |

3

1              THE COURT:  Please be seated.

2              MR. GALARDI:  Good morning, Your Honor, Greg Galardi

3    on behalf of the Radnor debtors.  Your Honor, we have three

4    matters scheduled for today.  The first is the matter that we

5    mentioned before, the standing motion.  The other two are the

6    retention applications.  All are the Committee's motions.  So I

7    turn the podium over to Mr. Citera.

8              MR. CITERA:  Good morning, Your Honor.  Frank Citera

9    here on -- from Greenberg Traurig here on behalf of the

10   Official Committee.  As Your Honor knows, we have up today our

11   standing motion and we discussed the standing motion a little

12   bit earlier in the week, and I intend to make a fuller

13   presentation this morning on the standing motion.  And I think

14   as we suggested in the supplemental memorandum that we filed

15   earlier in the week, this is really a seminal moment in the

16   case, the decision as to who should prosecute these claims is a

17   critical juncture in the case.  The Court has now set a number

18   of trial days and on behalf of the Committee, what we ask,

19   Judge, is that we be allowed to prosecute these claims, try

20   this case and let's move forward with it.

21             As the Court is well aware, a debtor in possession

22   has a fiduciary duty to maximize the value of the estates.  And

23   the Third Circuit recognized in <u>Cybergenics</u>, and we've had a

24   lot of discussion of <u>Cybergenics</u> in this case, that this

25   situation immediately gives rise to the proverbial problem of

75

1  to get their day in court on all of these claims.

2          So whether it's evidence of that or otherwise, hold

3  it off until the end of that trial.  Don't try to get in the

4  way of that trial with the 9019.  However, I just want to

5  understand what our role will be with respect to 9019s and

6  settlements, whether or not the Committee or whether or not any

7  other creditors are interested in that.  Because we may just

8  step aside and let the litigation go forward and on the 16th or

9  whenever Your Honor enters your opinion, we'll deal with the

10  circumstances.

11          I throw that out.  That was a concern of theirs.  I

12  have a concern as to what I'm supposed to do as a fiduciary now

13  to try to settle this.  I don't want to participate in the two-

14  party litigation.

15          THE COURT:  Okay, what -- I'll leave it up to you and

16  Mr. Goldman whether you want to be here for that first trial.

17          MR. GALARDI:  Okay.

18          THE COURT:  But let me make this comment.  Quite

19  candidly, as some of these Counts I consider -- how should I

20  put it -- longshots and if we spend -- how many days are we

21  going to have for this trial?  Two, three, four?

22          MR. CITERA:  I thought on Wednesday you'd given us

23  about six or seven.

24          MR. GALARDI:  Which is our concern about settlement

25  and all of that, Your Honor.

**J&J COURT TRANSCRIBERS, INC**

76

1          THE COURT:  Well, let me just say that if at the end

2    of the day these Counts don't have merit sufficient for me to

3    enter anything in your favor, come fee application time, you

4    may be subject to a severe adjustment.

5          MR. CITERA:  I understand.

6          THE COURT:  I'm not making a judgment.

7          MR. CITERA:  Sure, no, I understand.

8          THE COURT:  I don't know enough about this -- I've

9    read your complaint, but I haven't seen the evidence.  But it's

10   going to be a very expensive proposition and unless the estate

11   benefits, I'm going to have to ask why anybody should be paid

12   for what we did.  Did you say six or seven days?

13         MR. CITERA:  If you -- I think we're starting

14   Thursday, Friday and then I thought you had cleared out most of

15   the following week.

16         MR. GALARDI:  I hope Your Honor can stand the trial.

17         THE COURT:  Okay.  Well, what I've cleared is six

18   days.

19         MR. CITERA:  yeah.  Well, I said six or seven, Judge.

20         THE COURT:  How many witnesses do you have?

21         MR. CITERA:  We're -- I guess that goes to part of

22   the pretrial issues.  We are working with Tennenbaum to put

23   together the exhibits in chronological order as the Court

24   suggested as well as a witness list.  About 15.

25         MR. OSTROW:  Good morning, Your Honor.  Ken Ostrow

**J&J COURT TRANSCRIBERS, INC**

88

1 We're not going to get involved in the litigation, but we'd

2 like to see the expert report filed because, though we're not -

3 - and I learned this from this Committee --

4            THE COURT:  Do you have an expert's report?

5            MR. CITERA:  Your Honor, it's being worked on.  I

6 mean, I think we suggested to the Court, I mean, we just

7 finished depositions two days ago.  We will certainly file it

8 with the Court.

9            MR. GALARDI:  And we would just like it under file.

10 And I think Mr. Rock, Professor Rock as well, I think, is doing

11 an expert report.  As long as it's filed, Your Honor, that's

12 all we cared about.

13            THE COURT:  Okay.

14            MR. CITERA:  And we're fine with that.

15            THE COURT:  Okay.

16            MR. GALARDI:  Thank you.

17            THE COURT:  All right.  Is there anything else?

18            MR. GALARDI:  No, Your Honor.

19            MR. CITERA:  No, Your Honor.  Thank you.

20            THE COURT:  Okay.  We stand in recess.

21                    *  *  *  *  *

22

23

24

25

89

1              C E R T I F I C A T I O N

2

3

4          I, Susan Holcomb, court approved transcriber, certify

5   that the foregoing is a correct transcript from the official

6   electronic sound recording of the proceedings in the above-

7   entitled matter.

8

9   /s/ Susan Holcomb              Date:  November 1, 2006

10  Susan Holcomb   AAERT CET **00273

11  J&J COURT TRANSCRIBERS, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**
**November 21 Transcript (Excerpts)**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Case No. 06-10894(PJW) |
| | ) | Chapter 11 |
| | ) | |
| RADNOR HOLDINGS | ) | |
| CORPORATION, ET AL., | ) | Courtroom No. 2 |
| | ) | 824 Market Street |
| Debtors. | ) | Wilmington, Delaware 19801 |
| | ) | |
| | ) | November 21, 2006 |
| | ) | 9:35 A.M. |

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Radnor:

Skadden, Arps, Slate, Meagher & Flom
By:  GREGG GALARDI, ESQ.
     MARK L. DESGROSSEILLIERS, ESQ.
     SARAH PIERCE, ESQ.
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899-0636

For National City
Business Credit:

Ashby & Geddes
By:  RICARDO PALACIO, ESQ.
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19801

Thorp Reed & Armstrong, LLP
By:  PAULA A. SCHMECK, ESQ.
One Oxford Centre, 301 Grant Street
14th Floor
Pittsburgh, Pennsylvania 15219-1425

ECRO:

Anissa Cothran

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

# TRANSCRIPTS PLUS
### 435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail courttranscripts@aol.com

215-862-1115     (FAX) 215-862-6639

2

Appearances:
(Continued)

For Prairie Packaging,        Bifferato, Gentilotti, Biden & Balick
Inc.:                         By:  GARVAN McDANIEL, ESQ.
                              1308 Delaware Avenue
                              Post Office Box 2165
                              Wilmington, Delaware 19899-2165

                              Bell, Boyd & Lloyd LLC
                              By:  CARMEN H. LONSTEIN, ESQ.
                              70 West Madison Street
                              Suite 3100
                              Chicago, Illinois 60602

For Creditors'               Greenberg Traurig, LLP
Committee:                    By:  VICTORIA W. COUNIHAN, ESQ.
                              The Brandywine Building
                              1000 West Street, Suite 1540
                              Wilmington, Delaware 19801

                              Greenberg Traurig, LLP
                              By:  NANCY A. MITCHELL, ESQ.
                                   NANCY A. PETERMAN, ESQ.
                                   FRANK CITERA, ESQ.
                              77 West Wacker Drive, Suite 2500
                              Chicago, Illinois 60601

The U.S. Trustee:            Office of the U.S. Trustee
                              By:  WILLIAM HARRINGTON, ESQ.
                              844 King Street
                              Wilmington, Delaware 19899

For Lehman Brothers:         Young Conaway Stargatt & Taylor, LLP
                              By:  SEAN BEACH, ESQ.
                                   JOHN DORSEY, ESQ.
                              The Brandywine Building
                              1000 West Street, 17th Floor
                              Wilmington, Delaware 19899-0391

For P.O.L. (NC)              Reed Smith, LLP
QRS 15-25:                    By:  GASTON LOOMIS, ESQ.
                              1201 Market Street, P.O. Box 1347
                              Wilmington, Delaware 19899

3

Appearances:
(Continued)

For Tennenbaum Capital:    Richards Layton & Finger, PA
                           By:  MARK COLLINS, ESQ.
                           One Rodney Square, P.O. Box 551
                           Wilmington, Delaware 19899

                           Milbank, Tweed, Hadley & McCloy
                           By:  FRED NEUFELD, ESQ.
                                KENNETH OSTROW, ESQ.
                                NEIL WERTLIEB, ESQ.
                                GREGORY BRAY, ESQ.
                           1 Chase Manhattan Plaza
                           New York, New York 10005-1413

                           Tennenbaum Capital Partners
                           By:  DAVID HOLLANDER, REPRESENTATIVE

For Special Committee:     WilmerHale
                           By:  JOHN SIGEL, ESQ.
                           399 Park Avenue
                           New York, New York 10022

For Wells Fargo            Kilpatrick Stockton, LLP
National Bank:             By:  ATHANASIOS AGELAKOPOULOS, ESQ.
                           Suite 2800, 1100 Peachtree Street
                           Atlanta, Georgia 30309-4530

For TransAmerica           Buchanan Ingersoll & Rooney PC
Occidental Life:           By:  MARGARET MANNING, ESQ.
                           The Brandywine Building
                           1000 West Street, Suite 1410
                           Wilmington, Delaware 19801

                           Freeborn & Peters
                           By:  STEVEN HARTMANN, ESQ.
                           311 South Wacker Drive, Suite 3000
                           Chicago, Illinois 60606-6677

For Woodcock Washburn:     Fox Rothschild LLP
                           By:  SETH NIEDERMAN, ESQ.
                                JOSHUA KLEIN, ESQ.
                           Mellon Bank Center,
                           919 North Market Street, Suite 1400
                           14th Floor
                           Wilmington, Delaware 19801-3046

4

Appearances:
(Continued)

| | |
|---|---|
| For Advantage Machinery Services: | The Bayard Firm<br>By:  CHARLENE DAVIS, ESQ.<br>222 Delaware Avenue, Suite 900<br>P.O. Box 25130<br>Wilmington, Delaware 19899-5130 |
| For Merrill Lynch Capital: | Werb & Sullivan<br>By:  DUANE WERB, ESQ.<br>300 Sullivan Avenue, P.O. Box 25046<br>Wilmington, Delaware 19899 |
| | Ober, Kaler, Grimes & Shriver<br>By:  THOMAS RAFFERTY, ESQ.<br>120 East Baltimore Street<br>Baltimore, Maryland 21202-1643 |
| For Maricopa County: | Monzack & Monaco<br>By:  KEVIN MANGAN, ESQ.<br>1201 N. Orange Street, Suite 400<br>Wilmington, Delaware 19801 |
| For Sysco: | Potter Anderson & Corroon, LLP<br>By:  LAURIE SELBER SILVERSTEIN, ESQ.<br>Hercules Plaza, P.O. Box 951<br>1313 N. Market Street<br>Wilmington, Delaware 19899-0951 |
| For Post: | Pachulski Stang Ziehl Young<br>        Jones & Weintraub<br>By:  CURTIS HEHN, ESQ.<br>919 North Market Street, 16th Floor<br>Post Office Box 8705<br>Wilmington, Delaware 19899-8705 |
| For Morgan Stanley: | Paul, Hastings, Janofsky & Walker LLP<br>By:  KRISTINE SHRYOCK, ESQ.<br>75 East 55th Street<br>New York, New York 10022 |

5

Appearances:
(continued)

For U.S. Bank:                    Margolis Edelstein
                                  By:   LUCIAN MURLEY, ESQ.
                                  The Curtis Center
                                  Fourth Floor
                                  One Independence Square West
                                  Philadelphia, Pennsylvania 19106-3304,

6

**INDEX**

| EXHIBITS | ID | EVID |
|---|---|---|
| D-1  Transcript of auction hearing | 99 | |

7

1          THE COURT:  Please be seated.

2          MR. GALARDI:  Good morning, Your Honor.  For the

3  record, Gregg Galardi on behalf of the Radnor debtors.

4          Your Honor, we have filed an amended agenda.  And

5  what I'd sort of like to do is give an overview of what we'd

6  like to accomplish today.

7          There is first some just general omnibus matters that

8  Mr. Desgrosseilliers of my office will handle.  Hopefully those

9  should take a few minutes.

10         Then I believe that there is a pending emergency

11 motion to hear the motion for stay pending appeal of Your

12 Honor's order of November 16th filed by the Committee that we

13 would like to take up.

14         And then after we take that up and hear Your Honor's

15 ruling with respect to that, if we're going to go forward with

16 the sale hearing, what I would like to do is proceed with the

17 sale hearing, but proceed by the following method:

18         I would like to take an adjournment to try to canvas

19 -- I think we've resolved a lot of the objections.  Try to take

20 a break to get our ducks in a row, see what kind of testimony

21 we're going to need today.  I think it's actually going to be

22 fairly light testimony, and mostly legal argument.

23         See if we can take an adjournment, and then come back

24 to Your Honor, and then put proffers on and try to resolve

25 those objections again if the sale hearing goes forward.

1        I think there should be a bond.  They should bond the

2    cost between now and December 1st, which I know they won't do,

3    and the extent they won't do.  They shouldn't be able to get

4    away with their litigation strategy impairing the rights of

5    other creditors.  That's what's happening here, Your Honor.

6        Thank you.

7        THE COURT:  Okay.  I'm going to deny the request for

8    a stay.  I think the Committee has been given a full and fair

9    opportunity to challenge this transaction.  And I must say,

10   when I received the proposed findings from each side last

11   Thursday, I read Tennenbaum's statement first, and subject to

12   some modifications, I felt it was reasonable.

13       And then when I read the Committee's proposed

14   findings, I really thought that I presided over a trial which

15   was different than the one that the Committee put on.

16       And, quite frankly, some of your proposed findings --

17   the Committee's proposed findings were outlandish in light of

18   the record that was established over that eight-day period.

19   And I -- I indicated several weeks ago that if the Committee's

20   complaint didn't have merit, then I would have to consider what

21   the consequences of that would be.  And the record -- I was --

22   every day at the end of each of those eight days, I scratched

23   my head and said, where is the Committee's case?  Where is the

24   smoking gun?  Of course, there was no smoking gun.

25       And all of the testimony was just totally contrary to

1  the theory, and it turns out to be nothing more than a theory,

2  that was presented in the complaint.  And I think the Committee

3  has been given more than a fair opportunity to present its

4  case.  It made no case.  Its case totally lacks merit.  Its

5  proposed findings were, quite frankly, outlandish in light of

6  the record.

7         And so I'm not disposed to extending any additional

8  favors to the Committee.  They've had an opportunity and they

9  failed to achieve the objective that they suggested was going

10  to be borne out by the record.

11         MR. GALARDI:  I would say, thank you, Your Honor.

12  Except if I really had an offer, I would have loved them to

13  have gotten a stay.  But I just don't think we have an offer.

14         With that, Your Honor, what I would like to do is

15  take an adjournment.  I don't believe we will need all of

16  today, obviously.  What I would ask for is if we could adjourn

17  to 11 to try to get our ducks in a row as to what objections

18  are still outstanding with respect to the sale order, making

19  sure we know what evidence we'll put on, I think we can then go

20  rather rapidly through the sale hearing today, resolving

21  objections and dealing essentially with proffers.

22         A lot of what Your Honor just heard with the stay

23  would be what you would end up hearing with respect to the

24  sale, as well, but I'd like to organize that and try to use

25  Your Honor's time efficiently.

76

1    protection.  We would pay essentially Tennenbaum's fees, which

2    would go to two sources, Milbank and Houlihan Lokey.

3            As we stand here today, we have not paid a penny of

4    those fees.  And if the sale closes, they'll just -- they'll

5    just pay those fees themselves.

6            There is the provision now in the amended and

7    restated provision, as I said, that the professional fees for

8    the Committee would be paid up to a maximum of $500,000 if the

9    Committee would walk away from the objection.  And obviously

10   candor, and it's -- the fact is that if we close this deal, and

11   if the Committee doesn't walk away, I don't believe we have

12   assets to pay the Committee's professional fees as we sit here

13   today, nor are they assumed obligations under the Tennenbaum

14   agreement.

15           I don't have an approved order to pay them out of the

16   DIP.  And other than that one group of professional fees, I

17   think we're administratively solvent and could go forward with

18   the case.

19           There is, as I mentioned in Mr. Springel's proffer,

20   if you look at -- I think it's 2.8B-1 -- no, that's a purchase

21   price adjustment where there's causes of action, they could

22   come back in where the 100 percent goes to pay back certain

23   assumed expenses.  And then 50 percent of avoidance actions.

24           Your Honor, as I sit here -- stand here today, I

25   don't know if there are any real big avoidance actions that

77

1  would ever get us out of the hole that might be committed by

2  the Committee's professional fees.

3          Again, -- and many of the professional fees -- and,

4  again, everybody litigates.  They decide what their positions

5  are.  Much of the professional fees, for example, of my firm, I

6  think we added about 800 to $900,000 by just standing on the

7  sideline.  Other professionals have gone up.  We have tried to

8  negotiate in good faith to get some carve out, some amount for

9  the Committee, but we've been able to do so.

10         So, I'm in the uncomfortable position to say, Your

11  Honor, we think we would approve a sale but the sale,

12  notwithstanding our best efforts, may leave the estate

13  administratively insolvent if not paid the Committee's

14  professional fees.  All other administrative expenses have been

15  assumed.  And the debtors' professionals, which really cover

16  Skadden and Wilmer are covered by that A.  I think Alvarez has

17  already been paid and covered.  And then Tennenbaum will pay

18  its own professionals.

19         I think there's a proffer from Tennenbaum with

20  respect to an evidentiary point that the Committee wanted,

21  which was with regard to adequate assurances or financial

22  structure.

23              (Attorneys conferring off-the-record)

24         MR. GALARDI:  So, that would be my evidentiary -- I

25  can answer questions about the A.P. I can go through the black

1  line for Your Honor, but I thought maybe we'd finish the

2  evidentiary portion with respect to Tennenbaum.

3           THE COURT:  Okay.  Who's going to proffer what?

4           MR. NEUFELD:  Good afternoon, Your Honor.  Fred

5  Neufeld, Milbank Tweed.  We brought with us Mr. Mick Fatelle

6  (phonetic) who is financial advisor to Milbank in connection

7  with the Radnor bankruptcy case, he's with Houlihan Lokey.  In

8  the event that any party to an executory contract or non-

9  residential real property lease contested our ability to

10  provide adequate assurance of future performance, no -- we've

11  resolved every objection.  So, there are no pending objections

12  asking for the offer of proof, so I don't think we need to put

13  that proffer on.

14           THE COURT:  Okay.

15           MS. PETERMAN:  Your Honor, Nancy Peterman on behalf

16  of the Committee.  I have simply asked about the last sentence

17  of V, as in Victory, and the order.  It's basically --

18           THE COURT:  Okay.  Hold on.  Let me see which one.

19           MS. PETERMAN:  Okay.  Mr. Neufeld just told me that

20  they're deleting that.  So, that would simply resolve --

21           MR. NEUFELD:  If you want to look at it, Your Honor.

22  It's Paragraph V, like Victor.

23           MS. PETERMAN:  It was basically asking for a solvency

24  finding for the new entity.

25           MR. NEUFELD:  That's correct, Your Honor.  But we

79

1  decided last night it wasn't necessary and we took it out.

2          THE COURT:  You say V?

3          MR. NEUFELD:  V like Victor.

4          MS. PETERMAN:  It was actually on my copy that was

5  handed out in court this morning.

6          THE COURT:  It says purchaser has provided adequate

7  assurance, is that it?

8          MR. NEUFELD:  That paragraph.  And it's the last

9  sentence of the paragraph.

10         MS. PETERMAN:  So, based upon the evidence -- I -- I

11 assume it's in your copy.  Based upon the adduced at the sale

12 hearing, the fair value of the business enterprise that

13 comprises the purchase assets taken as a whole is taken is

14 greater than the total amount of liabilities and it goes on.

15         MR. NEUFELD:  And if we decided to put on a proffer

16 with respect to any party to an executory, we would have put on

17 the evidence.  But we don't think it's necessary, and we're

18 taking that provision out of the order.

19         THE COURT:  That sentence out?

20         MR. NEUFELD:  Yes.

21         THE COURT:  Okay.

22         MR. GALARDI:  So, I was confused, Your Honor.  I

23 thought that sentence was still in and we needed some proof for

24 it.

25         THE COURT:  Okay.

80

1          MR. GALARDI:  And, Your Honor, just -- 3.2B is the

2   provision on the purchase price adjustment.  3.2A and 3.2B.

3   So, I thought I'd point that out since I referred to it.

4          THE COURT:  Okay.

5          MS. PETERMAN:  Your Honor, just on behalf of the

6   Committee.  With respect to the additional payments under the

7   MIP, we actually did not know that the debtors was moving

8   forward with those as to the sale hearing.  And Mr. Galardi had

9   stated on the record, I believe, at this morning's hearing that

10  the Committee consented.

11         I've had no opportunity to discuss that with the

12  Committee, so certainly Your Honor can rule.  But I just wanted

13  to correct that issue for the record.

14         With respect to the sale order, as Mr. Galardi

15  indicated, they're asking to incorporate the judgment.

16         I will note for the record that they're -- you know,

17  we are in the process of pursuing an appeal, as Your Honor --

18  as Your Honor is aware, and there's various findings already in

19  the order.

20         THE COURT:  Yeah, I --

21         MS. PETERMAN:  And I just wanted to --

22         THE COURT:  Mr. Galardi, I don't know why you need to

23  incorporate those findings.

24         MR. GALARDI:  I was just trying to save some time for

25  Ms. Peterman.

81

1          THE COURT:  It's a part of the record.

2          MR. GALARDI:  That's fine.  It's -- we don't need to

3  incorporate it.  If it's part of the record, Your Honor, we're

4  fine.

5          MS. PETERMAN:  Yeah, and there's a couple of other

6  findings.  Paragraph W, Paragraph X and some others that are

7  somewhat incorporating the judgment, and we just note that we

8  object to those and are pursuing an appeal.

9          With respect to the order, it also has a couple of

10  paragraphs.  Paragraph double E and 36, which is asking Your

11  Honor to waive the ten days stay of the effectiveness of the

12  sale order.  And for the reasons set forth on the record this

13  morning, we would object to those provisions, as well.

14          Moving to the asset purchase agreement, as Mr.

15  Galardi noted, Section 2.8 of the asset purchase agreement was

16  revised overnight, which deals with the payment of professional

17  fees.  And, again, you know, this provision is something we

18  haven't discussed with the Committee.  But the Committee, as

19  fiduciaries in the case, are pursuing the -- whatever they

20  believe to be the appropriate matters in the case.  And -- and

21  certainly asking professionals to withdraw pleadings in

22  exchange for payment of fees is not something I can agree to.

23          THE COURT:  Okay.

24          MS. PETERMAN:  In addition, the DIP budget did

25  provide, as Mr. Galardi noted, for payment of professional fees

82

and reserved amounts.  And when you combine the DIP budget,

along with other provisions that are effectively parsing out

amounts to the Committee, it would seem that the more equitable

result would be to have a carve out for all professionals.  And

to the extent these are allowed, the professionals would share

on a pro rata basis in that amount.

We understand and have heard Your Honor's comments

and obviously know we have to come back in front of you with a

fee application, and would only be paid what -- our allowed

fees.

We also object to the provision --

THE COURT:  I'm sorry.  Are you asking me to require

T.C.P. to do a carve out?

MS. PETERMAN:  What this provision does is it

effectively sets aside $3.5 million for the debtors'

professionals and 500,000 for the Committee.  But under certain

circumstances, which we're not going to be able to agree to.

So, to the extent there's money set aside for professionals, it

seems like it should be set aside for all professionals, the

$3.5 million.  And to the extent fees are allowed, all the

professionals would be paid from that amount.

The Committee's professionals includes more than our

firm.  There's other professionals who also worked on this

case.

We also object to the provision which is in Section

1  3.2B of the asset purchase agreement, which is an issue we had

2  raised back at the bid procedures hearing.  That provision

3  allows for Tennenbaum to be reimbursed for the wind down

4  amount, which is 750,000.  And then also be reimbursed for 50

5  percent of pretty much all reclamation and 503(b)(9) claims

6  that they pay.  To the extent they pay the wind down amount or

7  any -- they pay any 503(b)(9) claims or they pay reclamation

8  claims, they get reimbursed first dollars out on the avoidance

9  actions, which we believe should be left behind for the

10  creditors of the estate.

11          THE COURT:  Was that in the original asset purchase

12  agreement?

13          MS. PETERMAN:  It was, and we objected to that

14  provision, and it was noted in all the notices that went out to

15  -- with -- all the notices that went out with respect to the

16  sale, the Committee objected to that provision.

17          THE COURT:  And where is that provision?

18          MS. PETERMAN:  It's Section 3.2B, and I'm working off

19  a red line copy which was Page 22 of the red line that I

20  received this morning.

21          MR. GALARDI:  It is the purchase price adjustment

22  paragraph, Your Honor.

23          MS. PETERMAN:  Right.

24                      (Pause)

25          THE COURT:  Okay.  So, they get reimbursed just for

1 the wind down amount, right?

2        MS. PETERMAN:  For the wind down amount, and then the

3 amounts that they're assuming under Section 2.3E, which is

4 503(b)(9) claims and then also reclamation claims, which I

5 don't know if there are any -- any such claims.

6        MR. GALARDI:  Your Honor, on the purchase price

7 numbers, I think we think that the maximum 503(b)(9) would be

8 $2 million worth of claims.  And, yes, there would be -- if

9 that is allowed, the idea -- and I'll let Tennenbaum address

10 it, but the idea that was told to me was that as recoveries

11 come in, they're going to be using money that would have gone

12 to their secured claims to pay administrative claims.  And so

13 in the order of priority, if they're paying administrative

14 claims before their own secured claim, they should be able to

15 get credit for that.  That was the theory on which they put

16 that provision in.

17        MS. PETERMAN:  And, again, you know, we are pursuing

18 an appeal.  So, to the extent that we were able to obtain some

19 relief with respect to Tranche C, and that secured claim, we'll

20 say, were to go away, it would seem that the avoidance action

21 should remain for the estate and for the creditors of the

22 estate not to reimburse Tennenbaum for amounts they've assumed

23 under the asset purchase agreement.

24        THE COURT:  Well, this provision was also in the

25 original A.P.A., wasn't it?

1          MR. GALARDI:  Yes.

2          MS. PETERMAN:  It was, Your Honor.  And we objected

3   to that provision at the bid procedures hearing and included

4   within all the notices that went out that the Committee

5   objected to that particular provision.

6          THE COURT:  Who decides whether avoidance actions

7   will be pursued?

8          MS. PETERMAN:  I assume the debtor does at the

9   moment.

10          MR. GALARDI:  At the moment we do, Your Honor.  We --

11   there is an excluded asset and the avoid actions are the

12   estate's and remain the estate's.  I can find the specific

13   provision, but I think it's two point -- there it is --

14   excluded assets -- it is 2.2H is the debtors' excluded

15   avoidance actions of sellers against non-seller third parties.

16   They remain excluded assets.

17          So, until this estate is wind down, we get to decide

18   which are pursued.

19          THE COURT:  Okay.  It's not unusual in my experience

20   that the debtor would waive the avoidance actions because the

21   buyer wants a continuing relationship with pre-petition

22   vendors.

23          MR. GALARDI  Your Honor, please don't suggest

24   anything more they can have.

25          We did not want to give them that because --

86

1           THE COURT:  Well, my point is I think this provision

2    is similar to that.

3           MR. GALARDI:  Oh, okay.

4           THE COURT:  So, it seems to me that it's an

5    appropriate provision to negotiate in an A.P.A.

6           MR. GALARDI:  Your Honor, I would rather you take out

7    3.1B to give me back those things because we did manage this.

8    But I under -- I understood their argument and you're

9    absolutely right.  We've done a lot of agreements that say that

10   we would have to waive them at their discretion because of

11   their customer relations.

12          MS. PETERMAN:  And then finally, Your Honor, just,

13   again, to note for the record, Section 12.11 of the asset

14   purchase agreement contains a release in favor of Tennenbaum

15   and we are pursuing an appeal and would note our objection to

16   that provision.

17          THE COURT:  Okay.  Well, with that provision as well

18   as others, if I get reversed, they don't have any meaning.

19          MS. PETERMAN:  I understand, Your Honor.

20          THE COURT:  Okay.

21          MS. PETERMAN:  I simply note those for the record.

22          THE COURT:  Okay.  Well, I'm going to overrule the

23   objections.  Then the only one I need to focus on now is the --

24   the Section 3.8.  And I can't impose a pulling of fees

25   arrangement because I strongly suspect that the Committee's

1   fees are rather substantial.  And that may work an unfairness

2   as to counsel for the company and the Lehman Brothers/Lazard

3   matter.

4           And I just -- I think that Tennenbaum was entitled to

5   negotiate these matters and it certainly seems logical that --

6   particularly, one, the dispute regarding their debt being debt,

7   that he shouldn't have to give money to the Committee or to the

8   Committee's professionals.  And I don't know what is left in

9   the estate and to what extent the -- all the professionals may

10  be paid in full.

11          So, I just can't rewrite this agreement.  And I

12  understand where Tennenbaum is coming from.  And I think

13  they're entitled to take that position.  And we'll have to see

14  the consequences of it at some later date.

15          And, of course, my understanding is the original

16  A.P.A. didn't have any carve out for the Committee

17  professionals.

18          MR. GALARDI:  It did refer to the same seller

19  language.

20          MR. NEUFELD:  You're correct, Your Honor.  Fred

21  Neufeld, again, of Milbank Tweed for the Tennenbaum parties.

22          I suppose you don't have a copy of the DIP order

23  before you, and I'm not going to read verbatim from it.  But

24  the DIP order was -- oh, you do have it?

25          THE COURT:  Yes.

1    MR. NEUFELD:  Oh, good.  Look at Page 52, Paragraph

2  26.

3    THE COURT:  52?

4    MR. NEUFELD:  Yes.  Page 52, Paragraph --

5    THE COURT: Yes.

6    MR. NEUFELD:  And if you look -- you start with the

7  second sentence, I'm sorry, the third sentence that begins

8  notwithstanding, about five lines down.

9    THE COURT:  Okay.

10    MR. NEUFELD:  "Notwithstanding anything" -- I don't

11  know why I need to read it, you have it.  But the bottom line

12  is it prohibited the use of both pre-petition and post petition

13  collateral, and borrowings under the DIP agreement --

14    THE COURT:  Yeah.

15    MR. NEUFELD:  -- to object, hinder Tennenbaum,

16  recourse to its collateral, hinder Tennenbaum's assertion of

17  its rights under the secured -- I mean it's very broadly

18  written.  And it's, you know, pretty much boilerplate now in

19  these DIP orders.

20    But everyone knew that unless the Committee was

21  successful in finding a way to recharacterize our debt or

22  equitably subordinate the debt, or avoid some of our liens,

23  which they tried to do, unless they were able to do that,

24  there's really no mechanism in this estate to pay them other

25  than the $200,000, which the DIP order carves out for their

89

1  investigation period, which we've provided $500,000 in the

2  A.P.A.

3          So -- and which they can still get from whatever

4  assets are left in the estate, whether it's voided -- avoidance

5  actions or other excluded assets.

6          THE COURT:  Okay.  I understand your point.

7          MR. NEUFELD:  Yeah.

8          THE COURT:  And I agree, this is pretty much

9  boilerplate for DIP facility orders.

10          MS. PETERMAN:  Your Honor, just to be clear.  The

11  Committee, while it certainly pursued litigation, also did

12  other things in the case that wouldn't fall within that

13  provision.  And under the DIP order, Tennenbaum had agreed to a

14  200,000 carve out --

15          THE COURT:  Right.

16          MS. PETERMAN:  -- per investigation and Silver Point

17  agreed to a $100,000 carve out per investigation, which now is

18  being wholesale modified by the asset purchase agreement, and

19  there's no monies left to cover those amounts which were

20  previously provided for in the DIP order.

21          THE COURT:  Well, I assume you still get -- the

22  Committee gets the 200,000, don't they --

23          MS. PETERMAN:  Um --

24          THE COURT:  -- haven't already gotten?

25          MS. PETERMAN:  Not unless we agree to take no further

90

1  action in the case under the asset purchase agreement.  So,

2  there are --

3          THE COURT:  Well, that would effectively modify the

4  DIP facility order, wouldn't it?

5          MS. PETERMAN:  Yes, it would.

6          THE COURT:  How do you do that?

7          MR. GALARDI:  Pay off the DIP and you retire it.  And

8  this is --

9          MS. PETERMAN:  Your Honor, you should -- well,

10  certainly you can pay off the DIP and retire it.  There are

11  certain provisions in the DIP order which provided for these in

12  certain circumstances.  There was a budget that budgeted

13  amounts for committee professionals, as well, all to the extent

14  that these were allowed, understanding we have to come back for

15  -- in front of you on a fee application.  And given how quickly

16  the case has proceeded, we haven't been in front of you yet on

17  a fee application.

18          THE COURT:  Look, as far as I'm concerned, there's

19  200,000 there waiting to be tapped by the Committee

20  professionals, i.e., with respect to the investigation they

21  did.

22          MS. PETERMAN:  And there's also an additional -- in

23  the order an additional 100,000 for Silver Point's

24  investigation.

25          THE COURT:  Oh, okay.

1          MR. NEUFELD:  Just on that point, Your Honor, the DIP

2   order authorizes the Committee to be paid from estate assets up

3   to $200,000 and $100,000, but doesn't require Tennenbaum to pay

4   it.  It just simply provides that from estate assets, they're

5   entitled to get paid.  And the A.P.A. doesn't prevent them from

6   getting paid from estate assets.

7          THE COURT:  I don't think that was the intent.  I

8   look at this as a guarantee that the Committee would get at

9   least $200,000 for its investigation.  That's how I read it.

10              (Attorneys conferring off-the-record)

11          MR. NEUFELD:  I will -- I will get authorization from

12  my client to address that issue, Your Honor.

13          THE COURT:  Okay.

14          MS. LONSTEIN:  Good afternoon, Your Honor.  As I

15  understand it, we do not have an agreement.  Or do you want to

16  find out if we have an agreement?  Prairie has filed an

17  objection to the assumption.

18          THE COURT:  I am aware of it.

19          MS. LONSTEIN:  And --

20          THE COURT:  Your objection is well taken.

21          MS. LONSTEIN:  Thank you.  I don't mind allowing them

22  to wait one moment, but I have been waiting since 9:30 this

23  morning and I would like to proceed.  So, if Your Honor doesn't

24  mind and we give them a couple of minutes to find out if they

25  have authority, perhaps there is a resolution here.

98

1    up, that's the kind of claim we would envision it would be.

2         And actually, Your Honor, the point of the assignment

3    of rights of the confidentiality agreements to Prairie is to

4    ensure that we have other parties to look to, other than an

5    insolvent estate on account of any of those types of breaches.

6    So, that is correct.

7         THE COURT:  Okay.

8         MS. LONSTEIN:  That concludes the Prairie objection,

9    Your Honor.  We'll have a stipulation approved by the relevant

10   parties and submit it to the Court shortly.

11        Thank you, Your Honor.

12        THE COURT:  Okay.

13        MR. NEUFELD:  Your Honor, Fred Neufeld of Milbank

14   Tweed for the Tennenbaum entities.  We've agreed to make two

15   additional revisions to the asset purchase agreement and sale

16   order.

17        First, in the sale order, we're going to provide that

18   purchaser shall pay the Committee's professionals $200,000 for

19   the fees incurred in connection with the investigation

20   contemplated by the DIP order, and up to $100,000 for the

21   Committee's investigation of the Silver Point pre-petition

22   secured claims.

23        They've informed us it may be less than a hundred.

24   We're certain Tennenbaum is more than two hundred.  So, two

25   hundred plus up to an additional one hundred.

1          And in addition, Your Honor, something that we need

2   to clarify in the order, or we're going to, and that is that

3   purchaser shall pay for all U.S. Trustee fees.  And that's

4   going to get put into the order, as well.

5          THE COURT:  Okay.

6          MR. GALARDI:  Your Honor, just before I have a --

7   we've asked you to take judicial notice of the record in the

8   cases.  The only document that I would like to submit in

9   support of the sale is a rather short document, it's the

10  auction transcript, the exhibits to the auction transcript, if

11  I may hand it up.  It's marked Debtor's Exhibit 1.

12         THE COURT:  Okay.

13         MR. GALARDI:  Your Honor, with that, I think that we

14  have concluded our evidence with respect to the sale.  And we

15  would ask Your Honor to approve the sale motion and the sale

16  order and as with the modifications that were put on the record

17  today, and based on the testimony adduced at this, and the

18  record in these cases.

19         THE COURT:  When do you expect to submit an order?

20         MR. GALARDI:  We're working on interlineating the

21  actual form right now, Your Honor.  So, I'm hoping before three

22  o'clock.

23         THE COURT:  Okay.  Are there any unresolved matters?

24  I've lost track.

25         MR. GALARDI:  I do not believe that there are any

100

1   unresolved.  They've either been incorporated into the order or

2   overruled on the record with respect to the ones that the

3   Committee identified.  I think we are now resolved with all of

4   the issues.

5           THE COURT:  Okay.  All right.  Then we stand in

6   recess.

7           MR. GALARDI:  Your Honor, I actually think -- is this

8   -- this is -- Your Honor, if you'd like -- let us -- let's

9   review.  Thank you, Your Honor.  May we use the courtroom for a

10  little while?

11          THE COURT:  Yes.

12          MR. GALARDI:  Thank you.

13              (Recess 2:31 P.M./Reconvene 2:48 P.M.)

14          THE COURT:  Please be seated.  I just had one

15  question on the sale order, and maybe it's because I don't

16  understand something.  On finding Z, this relates to the WinCup

17  secured debt.

18          MR. NEUFELD:  Yes, Your Honor.

19          THE COURT:  And the last sentence says, "The parties

20  have not reached -- concluded negotiations."

21          But then in Ruling Number 30, it talks about the

22  WinCup secured debt remaining undisturbed.

23          MR. NEUFELD:  At the -- at the time, we --

24          THE COURT:  Is there more to that than what is in 30?

25          MR. NEUFELD:  No, Your Honor.  We have agreed on all

101

1    the deal terms, but there are no documents yet.  There are a

2    substantial number of assumption agreements that are going to

3    be drafted.  In fact, I just got an e-mail from Mr. -- the

4    person who spoke on the phone asking us to start executing the

5    assumption agreement.

6              THE COURT:  Oh, okay.  So, that reference in Z was

7    only to the assumption documents?

8              MR. NEUFELD:  That's correct, Your Honor.

9              THE COURT:  Okay.

10             MR. NEUFELD:  Yes.

11             THE COURT:  That was the only question I had.

12             MR. NEUFELD:  Okay.  Thank you.

13             THE COURT:  Okay.  I'll sign the order and have it

14   docketed.

15             MULTIPLE SPEAKERS:  Thank you, Your Honor.

16             THE COURT:  Okay.  We stand in recess.

17             MR. NEUFELD:  Thank you again.  Have a nice

18   Thanksgiving.

19                  (Proceedings Adjourn at 3:51 P.M.)

20

21

22

23

24

25

102

1

2

3

4                    C E R T I F I C A T I O N

5

6          I, Karen Hartmann, certify that the foregoing is a

7   correct transcript to the best of my ability, from the

8   electronic sound recording of the proceedings in the above-

9   entitled matter.

10

11   /s/  Karen Hartmann                    Date:  December 2, 2006

12  TRANSCRIPTS PLUS

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I, Mark L. Desgrosseilliers, hereby certify that on January 22, 2007, I caused the foregoing **Objection of Debtors to Appellant's Motion to Expedite Appeal of Issues 4 through 9 Relating to Compensation of Committee's Professional Advisors, and to Stay All Other Issues on Appeal Pending Resolution of the Expedited Appeal** to be served on the parties listed on Exhibit A, attached hereto, in the manner indicated thereon.

_/s/ Mark Desgrosseilliers_
Mark L. Desgrosseilliers

**EXHIBIT A**

**Debtors:**

Caroline Williamson
Radnor Holdings Corporation
150 Radnor Chester Road
Building A, Suite 300
Radnor, PA 19087

Alvarez & Marsal, Inc.
Stan Springel
Robert McEvoy
600 Lexington Avenue
6th Floor
New York, NY 10022

**United States Trustee:**

William K. Harrington, Esq.
Margaret Harrison Esq.
Office of the U.S. Trustee
844 King Street
Room 2207, Lockbox 35
Wilmington, DE 19801
Tel: 302-573-6491
Fax: 302-573-6497
**(By Hand Delivery)**

**Agent for the DIP Lenders:**

Laura Davis Jones, Esq.
James E. O'Neill, Esq.
Pachulski Stang Ziehl Young
Jones & Weintraub
919 North Market Street, 17th Fl.
P.O. Box 8705
Wilmington, DE 19899-8705
**(By Hand Delivery)**

Anup Sathy, Esq.
Ross M. Kwasteniet, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601-6636
**(By Overnight Courier)**

**Counsel for the Funding Agent:**

Paula A. Schmeck, Esq.
Thorp, Reed & Armstrong, LLP
One Oxford Centre
301 Grant Street, 14th Fl.
Pittsburgh, PA 15219
**(By Overnight Courier)**

William P. Bowden, Esq.
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
**(By Hand-Delivery)**

**Official Committee of Unsecured Creditors:**

Donald J. Detweiler, Esquire
Victoria W. Counihan, Esquire
Greenberg Traurig, LLP
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, Delaware 19801
Telephone:  302-661-7667
Fax:  302-661-7360
**(By Hand-Delivery)**

Nancy A. Mitchell, Esquire
Nancy A. Peterman, Esquire
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 2500
Chicago, IL 60601
**(By Overnight Courier)**

**Counsel to Tennenbaum Capital Partners, LLC:**

Mark D. Collins, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
**(By Hand Delivery)**

Gregory A. Bray, Esq.
Fred Neufeld, Esq.
Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street
30th Flooor
Los Angeles, CA 90017-5735
**(By Overnight Delivery)**